UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| MEMBERS HERITAGE CREDIT UNION, | ) ) ) | |
| | ) | Civil Action No. 5:21-CV-207-CHB |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPNIION** |
| | ) | **AND ORDER** |
| NEW YORK MARINE & GENERAL INSURANCE COMPANY, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Motion for Summary Judgment filed by Plaintiff

Members Heritage Credit Union ("Members Heritage"), [R. 31]; the Motion for Summary

Judgment filed by Defendants New York Marine & General Insurance Company ("New York

Marine") and ProSight Specialty Management Co., Inc. ("ProSight"),[1] [R. 32]; and the parties'

responses to the Court's October 17, 2022 order. [R. 40]. In that order, the Court directed the

parties to file simultaneous briefs on the issue of whether the Court should exercise its

discretionary jurisdiction under the Declaratory Judgment Act. *Id.* Members Heritage filed its

brief asking that the Court decline jurisdiction over the entire suit. [R. 41]. The defendants filed

their brief arguing that the Court should accept jurisdiction. [R. 42]. The parties also filed

response briefs. [R. 44; R. 45]. The jurisdictional matter and the pending motions are therefore

---

[1] Members Heritage named the following entities as defendants: New York Marine & General Insurance Company; ProSight Specialty Management Co., Inc.; and ProSight Specialty Insurance Company. The defendants have informed the Court that both New York Marine and ProSight do business as "ProSight Specialty Insurance"; however, there is no legal entity with that name. [R. 33, p. 2]. Members Heritage has not amended its complaint to eliminate ProSight Specialty Insurance as a named defendant, however. For purposes of this Memorandum Opinion and Order, the Court understands that the defendants include New York Marine & General Insurance Company and ProSight Specialty Management Co., Inc.

fully briefed and ripe for review. *See* [R. 38; R. 37; R. 39]. For the reasons set forth below, the

Court will retain jurisdiction over this action, deny Members Heritage's Motion for Summary

Judgment, [R. 31], and grant Defendants' Motion for Summary Judgment, [R. 32].

## I.   BACKGROUND

### A.  The Policy

At issue in this case is the Management and Security Liability Policy ("the Policy")

issued by New York Marine to Members Heritage, a credit union. *See* [R. 31-3 (the Policy)]. The

Policy begins with the following disclaimer: "*Some provisions restrict coverage. Do not rely on*

*the titles or captions used in this Policy. Read this entire Policy carefully to determine rights,*

*duties and what is or is not covered.*" *Id.* at 8 (emphasis in original).

The Policy goes on to list the various insuring agreements available to an insured,

including Management Liability Insuring Agreement C. *Id.* at 8–9. Under Insuring Agreement C,

> the insurance organization shall pay on behalf of any insured organization, loss for
> which the insured person is legally obligated to pay and that the insured person is
> indemnified by the insured organization, as a result of any claim first made during
> the policy period against the insured person, individually or otherwise, or, if
> exercised, during the Extended Reporting Period, for a wrongful management
> liability act.

*Id.* at 8. In other words, absent any exclusions, the insurance company will indemnify Members

Heritage for losses resulting from claims for wrongful management liability acts. The Policy

defines many of these terms. For example, a "claim" includes "[a] written demand to any insured

for monetary damages or legal or equitable non-monetary relief," as well as "[a] civil proceeding

brought against any insured commended by the service of a complaint or similar pleading." *Id.* at

43. A "wrongful management liability act" is defined as "any actual or alleged[] [e]rror,

misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly

committed or attempted by any insured in their capacity as such" or "[m]atter claimed against an insured person solely by reason of his or her serving in such capacity." *Id.* at 49.

The Policy's declarations page indicates that Members Heritage purchased coverage under Insuring Agreement C, among other insuring agreements. *Id.* at 3. That page also explains that Insuring Agreement C allows for a $6,000,000 annual liability limit. *Id.* It further indicates that a $75,000 "per claim deductible" applies to Insuring Agreement C. *Id.*

The Policy later explains that all claims "arising out of the same wrongful act or interrelated wrongful acts of the insureds shall be deemed one claim." *Id.* at 38. Interrelated wrongful acts include "all wrongful acts that have a common fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes." *Id.* at 45.

The Policy also includes various exclusions. *See, e.g.*, *id.* at 10–11, 35–36. At issue in the present case are two exclusions: the Lending and Leasing Activities Exclusion and the Lien Holder Exclusion. Under the former, the insurance company "shall not be liable to make any payment . . . [f]or loss related to any claim based upon, arising out of, attributable to, or resulting directly or indirectly from" certain lending and leasing activities, which are discussed in more detail below. *Id.* at 53. The Lien Holder Exclusion similarly provides that the insurance company is not liable "[f]or loss related to any claim based upon, arising out of, attributable to, or resulting directly or indirectly from the status or activities of the insured organization as a lien holder or secured party." *Id.*

### B.  The Claims Against Members Heritage

From approximately 2010 through October 2016, Members Heritage operated a branch in Zebulon, North Carolina. [R. 1-1, pp. 1, 94, 96]. When Members Heritage took over that branch

in 2010, Johnny Harrell served as the branch manager, and he remained in that position under Members Heritage. *Id.* at 96. In October 2016, Members Heritage sold the Zebulon branch to Welcome Federal Credit Union ("Welcome") and transferred the branch's accounts and liabilities to Welcome. *Id.* at 7. Welcome continued to employ Harrell as the manager of the Zebulon branch. *Id.* at 96.

In August 2019, approximately three years after the sale of the Zebulon branch, Welcome discovered information indicating that Harrell was engaging in potentially fraudulent activity. *Id.* at 101. Apparently, between 2008 and 2019, Harrell repeatedly accepted money from credit union members with directions to invest those funds, but he instead misappropriated the funds. *See, e.g.*, *id.* at 97, 101. In April 2020, the United States filed a criminal action against Harrell in the Eastern District of North Carolina, accusing him of embezzlement. *Id.* at 102. Harrell pleaded guilty in June 2020. *Id.*

Meanwhile, Ted Brown, a credit union member at the Zebulon branch, sent a demand letter to Welcome and Members Heritage. [R. 34-1, pp. 76–78 (May 28, 2020 Letter)]. In that letter, dated May 28, 2020, Brown alleged that he deposited money at the Zebulon branch in September 2015 and, after being approached by Harrell, he authorized Harrell to invest part of that deposit in an annuity. *Id.* at 76. In October 2015, Harrell removed $100,000 from Brown's account but did not invest them as directed and instead misappropriated those funds. *Id.* at 76–77. Brown ultimately demanded that Welcome and Members Heritage repay the $100,000. *Id.*

Members Heritage informed its insurer, New York Marine, of Brown's claim. *See id.* at 79–84 (June 15, 2020 Letter). ProSight, acting as New York Marine's adjuster, handled the claim on the insurance company's behalf. *See id.* In a coverage position letter dated June 15, 2020, ProSight advised that New York Marine "has determined that the Demand Letter [from Brown]

potentially implicates" coverage under the Policy. *Id.* at 84. New York Marine therefore agreed to defend Members Heritage, subject to a reservation of rights, the Policy's $75,000 per-claim deductible, and the Policy's liability limits. *Id.*

Welcome then advised Members Heritage of its own claim. In a demand letter dated June 16, 2020, Welcome demanded that Members Heritage "accept responsibility" for Harrell's misconduct that occurred during his employment with Members Heritage. [R. 34-1, p. 86 (June 16, 2020 Letter)]. Welcome discussed Brown's claim, as well as alleged fraud committed against other credit union members. *Id.* For example, Harrell allegedly misused a line of credit belonging to Alvin Worner, a member of the Zebulon branch, by converting the line of credit to his own use after Worner had paid it off. *Id.* at 85. At the time Welcome acquired the Zebulon branch, the line of credit had an unauthorized balance of $297,721, which Welcome then had to write off after discovering Harrell's misconduct. *Id.* at 85–86. Welcome alleged that Members Heritage both knew about and actively concealed Harrell's misconduct. *Id.* Welcome ultimately demanded that Members Heritage compensate Welcome for the $297,721 loss. *Id.* at 86.

On July 16, 2020, after Members Heritage notified ProSight of Welcome's demand, ProSight sent an email to counsel for Members Heritage briefly discussing the interrelatedness of Welcome and Brown's claims, and further discussing the settlement negotiations with Brown. [R. 31-11 (July 16, 2020 Email)]. ProSight consented to Members Heritage "contributing up to $50,000 toward a settlement with Brown," under certain conditions. *Id.*  ProSight also stated that it would apply the $50,000 settlement payment toward the Policy's $75,000 per-claim deductible. *Id.*

On July 17, 2020, ProSight provided to Members Heritage a letter supplementing its coverage position with respect to Brown's claim and Welcome's demand. [R. 34-1, pp. 88–96].

Through its agent Judy Edwards, ProSight advised that "New York Marine has determined that the Welcome Demand Letter potentially implicates" coverage under the Policy. *Id.* at 91. ProSight also acknowledged that Welcome's demand letter and Brown's demand letter involved "interrelated wrongful acts," and they would therefore be "deemed one 'claim' under" the Policy. *Id.* at 90. As a result, "only one $75,000 deductible applie[d] to this single 'claim.'" *Id.* at 94. New York Marine ultimately agreed that it would defend Members Heritage subject to, among other things, a reservation of rights. *Id.* at 95.

In August 2020, Members Heritage and Welcome settled Brown's claim. [R. 34, p. 2]. New York Marine and ProSight applied Members Heritage's settlement payment and certain approved expenses against the Policy's deductible. *Id.*

Shortly thereafter, on October 19, 2020, Welcome filed suit against Members Heritage and Harrell in North Carolina. [R. 31-2 (Welcome Complaint)]. Welcome asserted three causes of action against Members Heritage: fraud/fraud in the inducement, negligent misrepresentation, and unfair or deceptive trade practices. *Id.* at 13–16. By letter dated November 16, 2020, ProSight informed Members Heritage that Welcome's lawsuit was not covered by the Policy. [R. 34-1, pp. 97–106 (Nov. 16, 2020 Letter)]. Specifically, ProSight explained that certain exclusions—namely, the Lending and Leasing Activities Exclusion and the Lien Holder Exclusion—were triggered by the Welcome suit and the allegations contained within that complaint. *Id.*

### C.  The Present Lawsuit

On June 14, 2020, Members Heritage filed a Complaint for Declaratory Relief in Fayette Circuit Court. [R. 1-1 (Complaint)]. The Complaint lists four counts. Count I does not list a legal theory or cause of action, but instead repeats many of the allegations already asserted in the

Complaint and alleges that Members Heritage relied upon its communications with ProSight to its detriment, New York Marine has wrongfully denied coverage, and New York Marine and ProSight have breached their contract with Members Heritage. *See id.* at 4–11. Count II is labeled as "Breach of Contract" and alleges that the Policy is ambiguous, New York Marine has wrongfully denied coverage, Members Heritage has a reasonable expectation of coverage, and New York Marine has waived any defenses by its prior conduct. *Id.* at 11–12. Count III is labeled as "Detrimental Reliance." *Id.* at 12. This count alleges that, based upon the terms of the Policy and the statements of ProSight's Judy Edwards, Members Heritage believed that it was entitled to coverage relating to Welcome's claims. *Id.* Count III further alleges that Members Heritage relied upon the representations of ProSight and therefore did not take any action to resolve Welcome's potential claims prior to the filing of Welcome's lawsuit. *Id.* at 12–13. Count IV does not list a cause of action or legal theory but is instead labeled "Ambiguities Must be Resolved in Favor of the Plaintiff." *Id.* at 13. This count does not include any allegations of ambiguities in the Policy, however, and instead asserts that Welcome's lawsuit does not fall within the Policy's exclusions, the defendant companies have breached the contract, and as a result, Members Heritage is entitled "to a recovery of all consequential damages and court costs as pleaded more specifically in the prayer for relief." *Id.* at 14.

The defendants filed an answer and asserted a counterclaim for a judgment declaring that the Policy does not provide coverage for the North Carolina lawsuit. *See* [R. 1-1, p. 131]. The defendants then removed the matter to this Court. [R. 1]. Sometime thereafter, Welcome and Members Heritage reached a confidential settlement in the North Carolina lawsuit. *See, e.g.* [R. 34, p. 3]. The parties have since filed motions for summary judgment, which remain pending. [R. 31; R. 32].

On October 17, 2022, prior to ruling on the summary judgment motions, the Court ordered the parties to file simultaneous briefs on the issue of whether the Court should exercise its discretionary jurisdiction under the Declaratory Judgment Act and pointed the parties to the five factors outlined in *Grand Trunk Western R. Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984). [R. 40]. Those briefs have now been filed. [R. 41; R. 42; R. 44; R. 45]. Accordingly, before turning to the Motions for Summary Judgment, [R. 31; R. 32], the Court must determine whether and to what extent it will exercise jurisdiction over Member Heritage's declaratory judgment claims.

## II.  ANALYSIS

### A.  The Nature of Member Heritage's Claims

Before considering the *Grand Trunk* factors, the Court must consider the precise nature of the claims asserted in the Complaint. In other words, the Court must determine whether this case presents claims for only declaratory relief or whether it presents mixed claims for declaratory *and* monetary relief. This distinction is important. In cases where only claims for declaratory relief are requested, the Court may exercise its discretion under the Declaratory Judgment Act to accept or decline jurisdiction over the entire action. *See, e.g.*, *Frankenmuth Mut. Ins. Co. v. Balis Campbell, Inc.*, 510 F.Supp.3d 482, 503 (E.D. Ky. 2020) (dismissing case without prejudice after weighing *Grand Trunk* factors). However, in cases where a plaintiff asserts claims for both declaratory and monetary relief, courts within the Sixth Circuit have taken varied approaches. In some cases, district courts have concluded that they must exercise jurisdiction over the monetary claims, and judicial economy counseled in favor of also exercising jurisdiction over "closely intertwined" declaratory claims. *Tibbitts v. Great Northern Insurance Co.*, 2:20-cv-10029, 2020 WL 4333546, *2 (E.D. Mich. July 28, 2020) (relying on *Adrian*

*Energy Associates v. Michigan Public Service Commission*, 481 F.3d 414 (6th Cir. 2006)); *see also General Star National Ins. Co. v. Terry Flinchum CPA, Inc.*, No. 6:22-CV-189-CHB, 2023 WL 3956150, *6 (E.D. Ky. June 12, 2023) (reviewing cases). Other district courts have taken a bifurcated approach, first applying the *Grand Trunk* factors to the declaratory claims, while separately considering whether they must retain jurisdiction over the claims for monetary relief. *See Ceres Enterprises, LLC v. Travelers Ins. Co.*, No. 1:20-CV-01925, 2021 WL 110789 (N.D. Ohio Jan. 12, 2021); *Family Tacos, LLC v. Auto Owners Ins. Co.*, No. 5:20-cv-01922, 2021 WL 110797 (N.D. Ohio Jan. 12, 2021); *Equity Planning Corp. v. Westfield Ins. Co.*, No. 1:20-cv-1204, 2020 WL 5909806 (N.D. Ohio Oct. 6, 2020). And at least one district court has found that a plaintiff's non-declaratory claims did not exist independently of its declaratory claims, and the court therefore declined jurisdiction over the entire suit. *Pupp v Illinois Union Ins. Co.*, No. 1:09-cv-532, 2010 WL 1258179 (W.D. Mich. Mar. 29, 2010).

Thus, to determine the proper approach in this case, the Court must first determine whether Members Heritage's Complaint raises only declaratory judgment claims, or whether it also seeks monetary relief. The answer to this question is not as straightforward as one might think. Looking to the plain language of that Complaint, the Court finds it to be poorly worded, at best. It is styled as a "Complaint for Declaratory Relief" and repeatedly refers to Kentucky Revised Statute ("KRS") § 418.040, Kentucky's declaratory judgment statute. [R. 1-1, pp. 1, 3]. It lists four counts, but does not clearly list four causes of action, and at most alleges (or attempts to allege) an unnamed Count I (presumably a claim for declaratory judgment), a breach of contract claim, and a detrimental reliance claim.

Importantly, the prayer for relief is also poorly written and organized. Looking at the plain language of that prayer for relief, it clearly seeks a "judgment declaring" that (1) New York

Marine is obligated to provide a defense in the North Carolina lawsuit, "including any cost of litigation and attorney's fees in defending said claim"; (2) New York marine is obligated to indemnify Members Heritage "for the damages sought [and now obtained] in the North Carolina litigation subject to any deductible"; and (3) that Members Heritage "should be awarded any and all other relief to which it may be entitled." *Id.* at 14. But it also seeks a "judgment declaring . . . [f]or recovery of all defense costs, attorney's fees and expenses incurred in defending the North Carolina litigation" and "[f]or any and all costs incurred in this declaratory judgment action, including court costs and attorney's fees." *Id.* at 14–15.

It is not until its *Grand Trunk* briefing that Members Heritage makes any real attempt to clarify the scope of this requested relief. In that briefing, Members Heritage continues to characterize this lawsuit as a "declaratory judgment action," but also refers to its "claims for breach of contract and detrimental reliance." [R. 41, p. 2]. Unlike its prior summary judgment briefing (or its Complaint), its *Grand Trunk* briefs now clearly and repeatedly refer to its request for "an award of damages" for breach of contract and detrimental reliance. *See* [R. 41, pp. 3, 5; R. 44, p. 2]. The defendants also seem to agree that the case presents damages claims in addition to the request for declaratory relief. [R. 42, pp. 1–2].

Having reviewed the Complaint and the briefing in this case, the Court finds that Members Heritage intended to allege a claim for declaratory judgment (Count I), as well as claims for breach of contract (Count II) and detrimental reliance (Count III),[2] for which Members Heritage seeks a money judgment for damages. As already noted, some courts within this circuit have found that a district court lacks discretion to decline jurisdiction over damages claims that were otherwise properly removed based on diversity jurisdiction, even if the court

---

[2] While the Complaint lists four "counts," there does not appear to be a fourth cause of action.

would otherwise decline jurisdiction over declaratory claims. *See, e.g.*, *Ceres Enterprises*, 2021 WL 110789, at *3 ("Where, as here, a federal court 'has independent diversity jurisdiction' over damages claims asserted along with a declaratory judgment claim, 'it is without discretion to remand' the damages claims." (quoting *Tibbitts*, 2020 WL 4333546, at *1)); *Equity Planning*, 2020 WL 5909806, at *4. And yet, at least one district court has remanded *both* claims for damages and declaratory relief after undertaking a *Grand Trunk* analysis and finding that the factors weighed in favor of declining jurisdiction. *See Pupp*, 2010 WL 1258179, at *3–4 (declining to accept the argument that the court's jurisdiction over damages claim was mandatory and remanding both declaratory and damages claims). However, while the bulk of persuasive authority indicates that a district court lacks discretion to decline jurisdiction over a damages claim in a diversity suit, this Court need not decide whether it must retain jurisdiction over Members Heritages damages claims. Here, for the reasons outlined below, the *Grand Trunk* factors weigh in favor of exercising jurisdiction over the declaratory claim, and judicial economy weighs in favor of addressing each of Members Heritage's claims in this Court.

   B. **The *Grand Trunk* Factors**

      1. **Factor One**

   The first *Grand Trunk* factor asks "whether the declaratory action would settle the controversy." *Id.* In the Sixth Circuit, "[t]wo lines of precedent seem to have developed in our jurisprudence regarding consideration of this first factor in the context of an insurance company's suit to determine its policy liability." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 555 (6th Cir. 2008). The key distinction between these two lines of precedent is whether the declaratory action must settle the controversy in the state court action, or whether it need only settle the insurance coverage dispute. *See Frankenmuth*, 510 F.Supp.3d at 489–90 (discussing the

- 11 -

split). Ultimately, the analysis "appears to depend in part on the overlap between the cases and whether the same parties are involved." *Pupp*, 2010 WL 1258179, at*2 (citing *Flowers*, 513 F.3d at 555).

The Court need not examine this Sixth Circuit split in detail, however, because here, there is no active and ongoing parallel state court proceeding. *See Clifford v. Church Mut. Ins. Co.*, No. 2:13-cv-853, 2014 WL 4805473, at *2 (S.D. Ohio Sept. 26, 2014) ("The first factor requires the Court to consider whether the dispute at issue is an 'independent dispute' or if there is a parallel state action." (citing *Grand Trunk*, 746 F.2d at 326)). At the time this Complaint was filed, the North Carolina lawsuit remained pending, but it has since been settled. In short, there is currently no active state action involving these parties or issues, and the present dispute is therefore considered to be an independent matter. "If the dispute is independent, the action will settle the controversy." *Id.* (citing *Grand Trunk*, 746, F.2d at 326). The Court therefore finds that this declaratory action will settle the parties' controversy, and this first factor weighs in favor of exercising jurisdiction. *See id.* (finding that first factor weighed in favor of exercising jurisdiction because there was no parallel state court proceeding); *Ceres Enterprises*, 2021 WL 110789, at *5 (same); *Equity Planning*, 2020 WL 5909806, at *8 (same).

### 2. Factor Two

Factor two considers "whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue." *Grand Trunk*, 746 F.2d at 326. This factor "is closely related to the first factor and is often considered in connection with it." *Flowers*, 513 F.3d at 557 (citing *Travelers Indem. Co. v. Bowling Green Prof. Assoc., PLC*, 495 F.3d 266, 271–72 (6th Cir. 2007)). As with the first factor, a split has developed among Sixth Circuit jurisprudence "concerning whether the district court decision must only clarify the legal relations presented in

- 12 -

the declaratory judgment action or whether it must also clarify the legal relations in the underlying state action." *Id.* (citations omitted). In *Flowers*, the Sixth Circuit also suggested that the district court should consider whether its decision would create any confusion about the parties' legal relations in any pending state court action. *Id.*

Again, the Court need not delve into the particulars of this Sixth Circuit split because there is no active parallel state court proceeding relating to the questions at issue in this federal case. As a result, "there is no risk of confusion about the legal relationships at issue in a state court action." *Equity Planning*, 2020 WL 5909806, at *8 (citing *Flowers*, 513 F.3d at 557). Furthermore, the instant declaratory action would settle the parties' controversy with respect to the coverage issues at play in this case, "and it follows that it would serve a useful purpose in clarifying the parties' legal relations with respect to [those] issue[s]." *Id.*; *see also Flowers*, 513 F.3d at 557 ("Indeed, it is almost always the case that if a declaratory judgment will settle the controversy, then it will clarify the legal relations in issue."(citing *Bituminous Cas. Corp. v. J & L Lumber Co.*, 373 F.3d 807, 814 (6th Cir. 2004); *Northland Insurance Co. v. Stewart Title Guaranty Co.*, 327 F.3d 448, 454 (6th Cir. 2003)). The Court therefore finds that this second factor weighs in favor of exercising jurisdiction.

### 3. Factor Three

The third factor asks whether the declaratory judgment action "is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for res judicata.'" *Grand Trunk*, 746 F.2d at 326. In other words, this factor asks "whether the declaratory plaintiff has filed in an attempt to get her choice of forum by filing first." *Flowers*, 513 F.3d at 558 (quoting *AmSouth Bank v. Dale*, 386 F.3d 763, 789 (6th Cir. 2004). When there is no evidence of an

improper motive, courts often give the "benefit of the doubt" to the declaratory plaintiff and find that the third factor is neutral. *See, e.g.*, *Bituminous*, 373 F.3d at 814.

In the present case, there is no evidence of an improper motive, and the defendants do not argue that any such improper motive exists or that any procedural fencing has been attempted. *See* [R. 42, p 3 ("[T]his action does not involve a race for res judicata.")]. The Court agrees that there is no evidence of procedural fencing or improper motive. However, "this factor should be afforded little weight in cases where . . . there is no evidence of procedural fencing." *Massachusetts Bay Ins. Co. v. Christian Funeral Directors, Inc.*, 759 Fed. App'x 431, 439 (6th Cir. 2019) (citing *Travelers*, 495 F.3d at 272). The Court therefore finds that the third *Grand Trunk* factor is neutral, and the Court will afford it little weight.

### 4.  Factor Four

The fourth *Grand Trunk* factor asks "whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction." *Grand Trunk*, 746 F.2d at 326. Like factors one and two, this factor focuses on the presence of novel or complicated state law or factual issues. *See, e.g.*, *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 400 ("For purposes of the fourth *Grand Trunk* factor, it is important simply to note that the question does not involve novel or complicated state-law or factual issues.").  On this point, the Supreme Court has warned that "a district court might be indulging in '[g]ratuitous interference'" if it permits a federal declaratory relief action to proceed when "another suit involving the same parties and presenting opportunity for ventilation of the same state law issues is pending in state court." *Flowers*, 513 F.3d at 559 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 283 (1995)).

The Sixth Circuit has identified three subfactors to aid courts in considering this factor:

(1) whether the underlying factual issues are important to an informed resolution of the case;

(2) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and

(3)  whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

*Bituminous*, 373 F.3d at 814–15 (citing *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 968 (6th Cir. 2000)); *see also United Specialty*, 936 F.3d at 396 (reciting the three subfactors).

The first subfactor "focuses on whether the state court's resolution of the factual issues in the case is necessary for the district court's resolution of the declaratory judgment action." *Flowers*, 513 F.3d at 560. Here, there is no pending state court action and therefore "no underlying factual issues pending resolution in a parallel state lawsuit that would prevent this Court from resolving the coverage question presented in [Members Heritage's] declaratory relief claim." *Ceres*, 2021 WL 110789, at *6; *see also Equity Planning*, 2020 WL 5909806, at *9; *Torre Rossa, LLC v. Liberty Mutual Insurance*, No. 1:20 CV 1095, 2020 WL 9599681, at *5 (N.D. Ohio Nov. 18, 2020). This subfactor therefore weighs in favor of exercising jurisdiction.

The second subfactor considers "which court, federal or state, is in a better position to resolve the issues in the declaratory action." *Flowers*, 513 F.3d at 560. Generally, there is a presumption that state courts are better suited to decide state law issues. *Ceres*, 2021 WL 110789, at *7 (citing *Flowers*, 513 F.3d at 560). Thus, if there are novel issues of state law involved, this subfactor will often weigh in favor of declining jurisdiction. *Flowers*, 513 F.3d at 560. However, where state law is clear and there are no unresolved factual issues that would affect the coverage issues, "this presumption carries less weight." *Ceres*, 2021 WL 110789, at *7 (citing *United Specialty*, 936 F.3d at 401). In the present case, the Court is unaware of any novel issues of state law that would affect the coverage questions presented in Members Heritage's

- 15 -

complaint. However, as this Court explained in *Frankenmuth Mutual Insurance Company v Balis Campbell, Inc.*, "novelty is not the only concern." *Id.* (quoting *Certain Underwriters at Lloyd's, London v. Abundance Coal*, No. 12-39-ART, 2012 WL 3067579, at *4 (E.D. Ky. July 27, 2012)) (internal quotation marks omitted). "[N]ovel or not," the state law issues could be resolved by the Kentucky court upon remand, and that state court has a "superior ability to apply its own law." *Id.*; *see also Grange Mut. Ins. Co. v. Safeco Ins. Co. of America*, 565 F. Supp. 2d 779, 790 (E.D. Ky. 2008 ("Since this is an insurance action, the state court is better situated to decide the issue, weighing against jurisdiction."). This subfactor is therefore best described as neutral.

Lastly, the third subfactor "focuses on whether the issue in the federal action implicates important state policies and is, thus, more appropriately considered in state court." *Flowers*, 513 F.3d at 560. Typically, in cases involving insurance contract interpretation issues, the Sixth Circuit has held that such issues are "questions of state law with which the Kentucky state courts are more familiar and, therefore, better able to resolve." *Id.* at 561 (quoting *Travelers*, 495 F.3d at 273) (internal quotation marks omitted). Thus, "even in cases where state law has not been difficult to apply, [the Sixth Circuit] has usually found that the interpretation of insurance contracts is closely intertwined with state public policy." *United Specialty*, 936 F.3d at 401. Here, the case involves interpretation of an insurance contract, an issue that is closely intertwined with state public policy. The Court therefore finds that this third subfactor weighs against exercising jurisdiction.

In sum, the first subfactor weighs in favor of exercising jurisdiction; the second subfactor is neutral; and the third subfactor weighs against exercising jurisdiction. The fourth *Grand Trunk* factor is therefore best described as neutral.

### 5. Factor Five

The final *Grand Trunk* factor asks "whether there is an alternative remedy which is better or more effective." *Grand Trunk*, 746 F.2d at 326. In many cases involving similar insurance coverage issues, the Sixth Circuit has held that an alternative remedy is available through a declaratory judgment under state law or an indemnity action in the state court at the conclusion of the liability proceedings. *See, e.g.*, *United Specialty*, 936 F.3d at 401–01; *Massachusetts Bay*, 759 Fed. App'x at 441–42; *Travelers*, 495 F.3d at 273; *Bituminous*, 373 F.3d at 816–17; *Manley, Bennett, McDonald & Co. v. St. Paul Fire & Marine Ins. Co.*, 791 F.2d 460, 462–63 (6th Cir. 1986). In those cases, the Court noted that the coverage issues involved questions of state law; they did not require application of federal common or statutory law. However, the Sixth Circuit has also acknowledged that "it is not clear whether such alternative remedies are better or more effective than a federal declaratory action." *Flowers*, 513 F.3d at 562. On this issue, Sixth Circuit "precedent is split regarding whether the possibility of seeking a declaratory judgment or an indemnity action in state court counsels against the district court exercising jurisdiction." *Id.* (citations omitted). More recently, however, the Sixth Circuit upheld the district court's determination that this factor weighed against exercising jurisdiction because a state court declaratory judgment action "would provide [the insurance company] with the same remedy it seeks in federal court, [and] the state remedy has the advantage of allowing the state court to apply its own law." *United Specialty*, 936 F.3d at 401. Ultimately, the relevant inquiry "must be fact specific, involving consideration of the whole package of options available to the federal declaratory plaintiff." *Flowers*, 513 F.3d at 562.

In the present case, the Court could exercise jurisdiction over Members Heritage's entire complaint, or the Court could remand the declaratory claims and stay the breach of contract and

detrimental reliance claims pending resolution of the declaratory issues.[3] However, "[s]uch an approach presents obvious inefficiencies compared to adjudicating all . . . claims in a single action." *Ceres*, 2021 WL 110789, at *8. As other courts within this circuit have held, when a suit presents claims for both declaratory and monetary relief, "declining to exercise jurisdiction over the declaratory claim lacks any comparative benefit." *Id.* (citations omitted); *see also Equity Planning*, 2020 WL 5909806, at *9 ("Staying [the plaintiff's] claims while an Ohio state court adjudicates [the plaintiff's] Declaratory Judgment claim is an alternative remedy, but it is not better, faster, or a more efficient use of judicial resources." (citing *Adrian Energy*, 481 F.3d at 422)). Because this Court will retain jurisdiction over Members Heritage's damages claims, this fifth factor weighs in favor of exercising jurisdiction over the declaratory claims.

### 6.  Balancing the Factors

The Sixth Circuit has never articulated the relative weight of each *Grand Trunk* factor, acknowledging instead that the factors are not always equal. *Flowers*, 513 F.3d at 563; *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014). This Court has stated, however, that "[t]he most important consideration in exercising this discretion [under the Declaratory Judgment Act] is whether retaining jurisdiction interferes with state-court litigation." *Abundance Coal*, 2012 WL 3067579, at *2. While this may be true, the Sixth Circuit has also indicated that "[t]he relative weight of the underlying considerations of efficiency, fairness, and federalism will depend on [the] facts of the case." *Hoey*, 773 F.3d at 759. In other words, the Court must balance the five *Grand Trunk* factors on a case-by-case basis. *See, e.g.*, *Frankenmuth*, 510 F.Supp.3d at

---

[3] One court found it appropriate to remand the damages claims as well as the declaratory claim. *See Pupp*, 2010 WL 1258179, at *3–4 (declining to accept the argument that the court's jurisdiction over damages claim was mandatory and remanding both declaratory and damages claims).

503. In doing so, this Court is afforded "unique and substantial" discretion. *Wilton*, 515 U.S. at 286.

In this case, the first and second factors weigh in favor of accepting jurisdiction. The third factor—whether the declaratory plaintiff is engaging in procedural fencing—is neutral. Given the lack of evidence to suggest procedural fencing, the Court assigns this third factor little weight. *Massachusetts Bay*, 759 Fed. App'x at 439 (citation omitted). The fourth factor is also neutral. Lastly, factor five weighs in favor of exercising jurisdiction.

Against these factors, the Court must balance "considerations of efficiency, fairness, and federalism." *Hoey*, 773 F.3d at 759.  The parties are no longer involved in a state court dispute. If the Court declines jurisdiction over the declaratory claims and remands those claims back to state court, it will force the parties to engage in litigation on two fronts—in state court for a resolution of the declaratory matter and in federal court for a resolution of the damages claims. This is not the better or more efficient course of action. Accordingly, for the reasons set forth above, the Court finds that the *Grand Trunk* factors, when considered together and balanced against considerations of efficiency, fairness, and federalism, weigh in favor of exercising jurisdiction.

### C. Motions for Summary Judgment

#### 1. Legal Standard

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

### 2. Declaratory Relief and Breach of Contract

Members Heritage alleges a breach of contract claim, as well as a related claim seeking a declaratory judgment that Members Heritage was obligated to provide a defense in the Welcome lawsuit and was further obligated to indemnify Members Heritage for the damages paid in that lawsuit. *See* [R. 1-1, p. 14]. Both of these claims require the Court to determine whether the Welcome lawsuit was covered under the Policy, such that New York Marine owed to Members Heritage a duty to defend and indemnify in that state court lawsuit, or whether it was excluded from coverage, as the defendants argue.

To prove a breach of contract under Kentucky law, a plaintiff must establish three elements: (1) the existence of a contract; (2) a breach of that contract; and (3) damages flowing from that breach. *Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009) (citation omitted).[4] In the present case, the parties do not dispute that a valid contract—namely, the Policy—exists. Rather, the crux of Members Heritage's argument is that the defendants breached the contract by declining to provide a defense and indemnification to Members Heritage in the Welcome lawsuit. *See generally* [R. 31-1; R. 37].  In other words, Members Heritage argues that the Welcome lawsuit is subject to coverage under the Policy, while New York Marine argues that such coverage is precluded by certain exclusions.

Typically, "interpretation of an insurance contract is a matter of law for the court."[5] *Stone v. Ky. Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809, 810 (Ky. Ct. App. 2000) (citing *Morganfield National Bank v. Damien Elder & Sons*, 836 S.W.2d 893 (Ky. 1992)); *see also ADA-ES, Inc. v. Big Rivers Electric Corp.*, 4:18-CV-00016-JHM, 2019 WL 332412, at *4 (W.D. Ky. Jan. 25, 2019) ("Under Kentucky law, 'the construction and interpretation of a contract including

---

[4] Both parties agree that Kentucky's substantive law applies. *See, e.g.*, [R 31-1, pp. 12–16 (arguing for the application of Kentucky law)]; [R. 33, p. 10 (applying Kentucky law)]. The Court also agrees. In a diversity action such as this, the Court "interpret[s] the contract as a Kentucky court would." *New London Tobacco Market, Inc. v. Kentucky Fuel Corp.*, 44 F.4th 393, 405 (6th Cir. 2022) (citation omitted). Kentucky, in turn, follows the Restatement's "most significant contacts" test to determine whether Kentucky law applies to a contract dispute. *First Mercury Ins. Co. v. ARMR Group*, 617 F. Supp. 3d 694, 699 (E.D. Ky. 2022) (citing *Saleba v. Schrand*, 300 S.W.3d 177 (Ky. 2009)). Here, the parties do not dispute that Kentucky has the most significant contacts with this contract and this case. Accordingly, the Court turns to Kentucky law.

[5] As an initial matter, the Court notes that neither party has identified a genuinely disputed issue of material fact relevant to these contract interpretation issues. In its briefing, Members Heritage states, "The nature of the factual dispute in this case is whether the insured, Members Heritage, which is the 'entity' described in the policy has engaged in a 'wrongful management liability' act." [R. 31-1, p. 14]. But the parties do not dispute that, *absent an exclusion*, coverage might exist under Insuring Agreement C, which applies to "wrongful management liability acts." *See* [R. 33, pp. 9–10 ("There is no dispute that Insuring Agreement C might afford coverage to Welcome's Complaint absent an exclusion.")]. The disputed issue in this case is whether an exclusion applies. Further, while Members Heritage argues that the Brown claim and the Welcome lawsuit are factually identical, *see, e.g.*, [R. 31-1, p. 23], that assertion is clearly contradicted by the Brown demand letter and the Welcome complaint, both of which are filed in the record. *See* [R. 34-1, pp. 76–78 (Brown Demand Letter); R. 31-2 (Welcome Complaint)]. There is no genuine dispute as to the contents of Brown's demand letter and Welcome's complaint.

questions regarding ambiguity are questions of law to be decided by the Court.'" (quoting *Hulda Schoening Family Trust v. Powertel/Kentucky Inc.*, 275 F. Supp. 2d 793, 794 (W.D. Ky. 2003))). As such, disputed issues of contract interpretation may be resolved at the summary judgment stage. *B.F. Goodrich v. U.S. Filter Corp.*, 245 F.3d 587, 595 (6th Cir. 2001).

To determine whether coverage exists, the Court turns first to the Policy's plain language. *New London Tobacco Market*, 44 F.4th at 405 (citing *Mostert v. Mostert Grp. LLC*, 606 S.W.3d 87, 91 (Ky. 2020)); *see also Burlington Ins. Co. v. Greenwood Rollerdrome, Inc.*, 420 F.Supp.3d 632, 641 (W.D. Ky. 2019). If the words of the Policy are unambiguous, the Court must enforce the contract strictly according to its terms, which are afforded their ordinary meaning. *Bluegrass Materials Co., LLC v. Freeman*, 54 F.4th 364, 371 (6th Cir. 2022) (citing *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003)); *Burlington Ins. Co.*, 420 F.Supp.3d at 644; *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 507 (6th Cir. 2003) (citations omitted). However, if the Policy's terms are ambiguous, those ambiguities must be construed against the drafter and in favor of the insured. *See, e.g.*, *Tower Ins. Co. of New York v. Horn*, 472 S.W.3d 172, 174 (Ky. 2015) (citation omitted); *Stone*, 34 S.W.3d at 810–11 (citations omitted).

On this point the Court notes that Members Heritage attempts to assert a cause of action in its Complaint for "Ambiguities Must be Resolved in Favor of the Plaintiff." [R. 1-1, p. 13]. In its summary judgment briefing, Members Heritage again goes on to recite this basic rule of contract interpretation. [R. 31-1, p. 13; R. 37, pp. 5–6]. However, nowhere in the Complaint or the summary judgment briefing does Members Heritage identify any specific language or terms that it believes to be ambiguous.

Nevertheless, Members Heritage appears to rely heavily on the doctrine of reasonable expectations. *See, e.g.*, [R. 37, p. 6]. The "basic thrust" of the reasonable expectations doctrine

"is 'that the insured is entitled to all the coverage he may reasonably expect to be provided under the policy.'" *Burlington Ins. Co.*, 420 F.Supp.3d at 644 (quoting *Kentucky Employers' Mut. Ins. v. Ellington*, 459 S.W.3d 876, 883 (Ky. 2015)). "Only an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage will defeat that expectation." *Id.* (quoting *Ellington*, 459 S.W.3d at 883) (internal quotation marks omitted). However, "[o]nly actual ambiguities in the policy language will trigger the doctrine of reasonable expectations." *Id.* at 645 (quoting *Sparks v. Trustguard Ins. Co.*, 389 S.W.3d 121, 128 (Ky. Ct. App. 2012)) (internal quotation marks omitted); *see also id.* at 644 (explaining that the reasonable expectations doctrine "resolves an insurance policy ambiguity in favor of the insured's reasonable expectations"); *National Union Fire Ins. Co. of Pittsburg, Pa. v. Papa John's Intern., Inc.*, 20 F. Supp. 3d 961, 971 (W.D. Ky. 2014) ("After careful review, the Court concludes that the reasonable expectations doctrine is inapplicable because the exclusion is unambiguous."). Members Heritage fails to point to any specific language that it believes to be ambiguous, and the Court finds no basis for concluding that any of the provisions at issue are ambiguous. The doctrine of reasonable expectations is therefore inapplicable. *See, e.g.*, *Burlington Ins. Co.*, 420 F. Supp. 3d at 645 (finding the doctrine of reasonable expectations to be inapplicable where the insured failed to identify any specific terms that were ambiguous).

By contrast, the defendants argue that the clear and unambiguous terms of the Policy exclude coverage, specifically pointing to the Lending and Leasing Exclusion and the Lien Holder Exclusion. *See, e.g.*, [R. 38, pp. 5–6]. The Court agrees. In reaching this conclusion, the Court is mindful that, under Kentucky law, such exclusions "are to be narrowly interpreted and all questions resolved in favor of the insured." *Secura Ins. Co. v. Gorsick*, No. 3:06CV-596R, 2008 WL 341383, *4 (W.D. Ky. Feb. 6, 2008) (quoting *Eyler v. Nationwide Mut. Fire Ins. Co.*,

824 S.W.2d 855, 859–60 (Ky. 1992)). However, this canon of contract interpretation is applicable only "when the language of the insurance contract is ambiguous or self-contradictory." *Id.* (quoting *Peoples Bank & Trust Co. v. Aetna Cas. & Sur. Co.*, 113 F.3d 629, 636 (6th Cir. 1997)) (internal quotation marks omitted). Where the language is unambiguous and not self-contradicting, "the contract is to be read according to its plain meaning, its true character and purpose, and the intent of the policies." *Id.* (quoting *Peoples Bank*, 113 F.3d at 636) (internal quotation marks omitted). As the Court has already explained, Member Heritage fails to identify any ambiguities in the Policy or its exclusions. Thus, the Court turns to the plain language of the exclusions.

Under the Lending and Leasing Activities Exclusion, the insurance company "shall not be liable to make any payment . . . [f]or loss related to any claim based upon, arising out of, attributable to, or resulting directly or indirectly from" certain lending and leasing activities, including

    a.  The rendering or failure to render loan servicing;
    b.  The restructure, termination, transfer, collection, repossession or foreclosure of any loan, lease or extension of credit originated by the insured organization;
    c.  An agreement, refusal, grant or extension of any loan, lease or extension of credit; . . .
    f.  The violation of any federal or state unfair or deceptive practices act, statute or regulation relating to an agreement, refusal, grant or extension of any loan, lease or extension of credit, but only related to paragraphs a., b. or c. above.

[R. 31-3, p. 53]. The Policy defines "loan servicing" as "the servicing of a loan, lease or extension of credit" and includes record keeping, billing, disbursing principal and interest for a loan, credit reporting or issuing statements of a borrower's creditworthiness; and receiving or paying insurance premiums and taxes. *Id.* at 52.

Kentucky law further explains that the words "arising out of" should be interpreted broadly. *Lifeline Health Group, Inc. v. National Union Fire Ins. Co. of Pittsburg, Pa.*, 665 F.

Supp. 2d 770, 776 (W.D. Ky. 2009) (citing *Hugenberg v. West American Ins. Co./Ohio Casualty Group*, 249 S.W.3d 174, 186 (Ky. Ct. App. 2006)). In the context of an insurance contract, those terms are "broad, general and comprehensive terms meaning 'originating from,' or 'having its origin in, 'growing out of' or 'flowing from.'" *Id.* (quoting *Hugenburg*, 249 S.W.3d at 186).

With these principles in mind, the Court turns to Welcome's allegations against Members Heritage.[6] Welcome's complaint alleges that Members Heritage improperly serviced the line of credit of "Member 1." Specifically, it alleges that Harrell altered Member Heritage's internal records to indicate that the line of credit remained open when it had actually been paid off by Member 1. [R. 31-2, ¶ 32]. Another potential buyer of the Zebulon branch flagged this issue, and Members Heritage then instructed Harrell to file a lien to secure the "phony" line of credit. *Id.* ¶¶ 33–34. Harrell then backdated a deed of trust to make it appear as though "the phony [line of credit] was actually the original, legitimate [line of credit]." *Id.* at ¶ 34. The complaint further alleges that Members Heritage "took the highly irregular action of filing a satisfaction for" the line of credit, which stated that the line of credit was paid off two days after Harrell filed the "phony deed of trust." *Id.* ¶ 35. This satisfaction was signed by Member Heritage's Lending Manager. *Id.* The complaint alleges that these actions were taken so that Members Heritage could conceal Harrell's fraudulent behavior, thereby making the Zebulon branch "more attractive" to potential buyers. *Id.* ¶ 36.

Members Heritage does not address each of the lending and leasing activities outlined above in subsections (b), (c), and (f), three of the four subsections cited by Defendants.[7] Instead,

---

[6] While Welcome's complaint also includes allegations against Harrell, the Court's analysis focuses primarily on the allegations against *Members Heritage*, the insured organization.

[7] Federal Rule of Civil Procedure 56(e) addresses situations in which a party "fails to properly address another party's assertion of fact" in a summary judgment motion. The provides that, in such situations, the court may take certain actions, including "consider[ing] the fact undisputed for purposes of the motion" and "grant[ing] summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant

it focuses on the "loan servicing" activities outlined in subsection (a). It appears to argue that Welcome's allegations do not trigger the Lending and Leasing Activities exclusion because there is no specific language in Welcome's complaint regarding the "rendering or failure to render loan servicing."[8] [R. 31-1, p. 19]. But Members Heritage fails to point to any language in the Policy or any controlling authority requiring such specific language in the body of the complaint. Instead, the Lending and Leasing Activities exclusion—specifically subsection (a) regarding loan servicing—clearly applies to allegations regarding the record keeping and disbursement of a loan, lease, or extension of credit (i.e., a line of credit). [R. 31-3, p. 52]. The allegations noted above are directly related to Members Heritage's record-keeping practices in relation to the servicing of Member 1's line of credit and improper disbursements, including its failure (intentional or not) to properly terminate the line of credit when it was paid off by the member, and its filing of an allegedly fraudulent deed of trust and satisfaction.

Other subsections of the Lending and Leasing Exclusion are also triggered by the allegations in Welcome's complaint. Subsection (b), for example, applies to "[t]he restructure, termination, transfer, collection, repossession or foreclosure of any loan, lease or extension of credit originated by the insured organization." [R. 31-3, p. 53]. This subsection is triggered because Welcome alleges that Members Heritage improperly filed liens and satisfactions concerning Member 1's line of credit, thereby covering up Harrell's misconduct. [R. 31-2,

---

is entitled to it." Fed. R. Civ. P. 56(e)(2), (3); *see also McDowell v. Mattingly*, 3:20-cv-383-CHB, 2021 WL 1535367, *3 (W.D. Ky. Apr. 19, 2021).

[8] In its response brief, [R. 37], Members Heritage also refers to "theft coverage" and appears to argue (from the best the Court can decipher) that Defendants have interpreted "loan servicing" to include theft. *Id.* at 7. This argument is unavailing. First, Members Heritage cites to a single case involving a car insurance policy that expressly included coverage for theft of the covered vehicles, *see id.* (citing *Best v. West American Ins. Co.*, 270 S.W.3d 398) (Ky. Ct. App. 2008), but makes no effort to explain how that case is applicable here. Further, to the extent Members Heritage argues that Harrell's theft does not qualify as "loan servicing," the Court notes that Welcome does not allege that Members Heritage stole from its members, but rather, it alleges that Members Heritage knew or should have known of Harrell's misconduct and took actions to cover up his wrongdoings.

¶¶ 33–36]. For similar reasons, subsection (c) is also triggered. That provision applies to "[a]n agreement, refusal, grant or extension of any loan, lease or extension of credit," and here, the allegedly wrongful actions taken by Members Heritage revolve around its agreement to "grant or exten[d]" Member 1's line of credit. [R. 31-3, p. 53]. The Court therefore finds that Welcome's claims against Members Heritage, as set forth in the Welcome complaint, trigger the Lending and Leasing Activities exclusion.

Furthermore, even if the Lending and Leasing Activities Exclusion did not apply, the Lien Holder Exclusion would bar coverage. Under that exclusion, which applies only to Insuring Agreement C, the insurance company "shall not be liable to make any payment . . . [f]or loss related to any claim based upon, arising out of, attributable to, or resulting directly or indirectly from the status or activities of the insured organization as a lien holder or secured party." [R. 31-3, p. 53]. Welcome's Complaint alleges that Members Heritage filed an allegedly fraudulent (i.e., backdated) deed of trust to secure a lien on Member 1's line of credit, then filed a satisfaction of that lien, all in an attempt to conceal Harrell's wrongdoing from potential buyers.  [R. 31-2, ¶¶ 32–36, 41]. Notably, Members Heritage does not dispute that these allegations are related, either directly or indirectly, to the "status or activities of the insured organization as a lien holder or secured party." [R. 31-3, p. 53]. In fact, Members Heritage wholly fails to address the Lien Holder Exclusion in its motion or its briefing. *See* [R. 31-1; R 37]. The Court, having considered the plain language of that exclusion and the allegations in Welcome's complaint, finds that Welcome's claims against Members Heritage are clearly "based upon, aris[e] out of, [are] attributable to, or result[] directly or indirectly from the status or activities of [Members Heritage] as a lien holder or secured party." [R. 31-3, p. 53]. Thus, Welcome's claims against Members Heritage trigger the Lien Holder Exclusion.

The Court therefore finds that the Lending and Leasing Activities Exclusion and the Lien Holder Exclusion provided a basis for New York Marine to deny coverage for the Welcome lawsuit. On this point, the Court notes that, from the best it can tell, Members Heritage attempts to argue that coverage under the Policy is illusory. *See, e.g.*, [R. 31-1, p. 16 ("Any other interpretation of the contract by the Defendants renders the coverage to the entity 'illusory' but for which a premium has been charged and paid. . . ."); R. 37, p. 5 ("To apply the 'loan servicing' exclusion in the broadest sense argued by the Defendants would render the entire Management and Security Liability Coverage inapplicable.")].  That said, Members Heritage seems to conflate illusory coverage with the reasonable expectation of coverage, and it makes no attempt to cite or apply any Kentucky law on the issue of illusory coverage. As such, to the extent that Members Heritage intends to make an illusory coverage argument, that argument is wholly undeveloped, and the Court need not consider it. *See Brown v. Astrue*, No. 09-387-HRW, 2010 WL 4878866, *3 (E.D. Ky. Nov. 24, 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)).

Even if the Court were to consider such an argument, it necessarily fails. An insurance policy provides illusory coverage "when an insured cannot foresee any circumstances under which he or she would collect under a particular policy provision." *Gower v. Alfa Vision Ins. Corp.*, No. 2015-CA-000804-MR, 2016 WL 6819754, at *3 (Ky. Ct. App. Nov. 18, 2016) (citing *Sparks*, 389 S.W.3d at 128–129). In other words, coverage under the policy "turns out to be functionally nonexistent." *Burlington Ins. Co.*, 420 F. Supp. 3d at 645 (quoting *Sparks*, 389

S.W.3d at 129). In this case, it would be disingenuous, at best, to argue that there are no foreseeable circumstances under which Insuring Agreement C provides coverage because Members Heritage *did* receive coverage under this provision for Brown's claim. That claim did not involve any of the excluded lending or leasing activities (e.g., loan servicing), nor was it in any way connected to Members Heritage's status as a lien holder. Simply put, Members Heritage has failed to explain how coverage under Insuring Agreement C qualifies as illusory, and this argument fails. *See id.* (finding that there were foreseeable scenarios that would be covered under the policy and coverage was therefore not illusory); *Ritchie v. Turner*, 547 S.W.3d 145, 149 (Ky. Ct. App. 2018) (finding that insured's illusory coverage argument failed because the exclusions at issue "do not negate all coverage").

In sum, the Court finds that the Lending and Leasing Activities Exclusion and/or the Lien Holder Exclusion bars coverage of the Welcome lawsuit. As such, the defendants did not breach the policy by failing to provide coverage, and they were not obligated to provide a defense to Members Heritage or to indemnify it for its losses stemming from that lawsuit. The Court will therefore grant summary judgment in favor of defendants on the declaratory judgment claim (Count I) and the breach of contract claim (Count II).

### 3. Detrimental Reliance, Estoppel, and Waiver

Members Heritage also raises a claim for detrimental reliance (Count III). It argues that it "acted in reliance upon the statements of Judy Edwards both with respect to settling the Tom Brown claim and in refraining from negotiations with [Welcome], which ultimate (sic) sued the Plaintiff in the state of North Carolina." [R. 31-1, p. 11]; *see also id.* at 22–23 ("The statements made by Judy Edwards in this case were relied on by Members Heritage in making a payment of $50,000.00 to settle one of the pending claims (Ted Brown) that had been asserted against it.").

For support, Members Heritage points to Edwards's testimony that she "encouraged" the Brown settlement and her statement that the Brown settlement payment would apply toward a single $75,000 deductible, which would cover both the Brown and Welcome claims. *Id.* at 7–9, 23; *see also* [R. 31-13 (Edwards Deposition)].[9]

As an initial matter, the Court notes that Members Heritage appears to use the terms "estoppel," "waiver," and "detrimental reliance" interchangeably. To be clear, however, "[w]aiver and estoppel, as applied to contracts of insurance, are terms often used interchangeably, but this obscures their meaning." *Howard v. Motorists Mut. Ins. Co.*, 955 S.W.2d 525, 526 (Ky. 1997) (quoting *Edmondson v. Pennsylvania Nat'l Mut. Casualty Ins. Co.*, 781 S.W.2d 753, 755 (Ky. 1989)) (internal quotation marks omitted). Waiver is the "voluntary and intentional relinquishment of a known, existing right or power under the terms of an insurance contract." *Howard*, 955 S.W.2d at 526 (quoting *Edmondson*, 781 S.W.2d at 755) (internal quotation marks omitted). Estoppel, on the other hand, "offsets misleading conduct, acts, or representations which have induced a person to rely thereon to change his position to his detriment." *Id.* (quoting *Edmondson*, 781 S.W.2d at 755) (internal quotation marks omitted). Estoppel, in turn, includes the following five elements:

> (1) Conduct, including acts, language and silence, amounting to a representation or concealment of material facts; (2) the estopped party is aware of these facts; (3) these facts are unknown to the other party; (4) the estopped party must act with the intention or expectation his conduct will be acted upon; and (5) the other party in fact relied upon this conduct to his detriment.

---

[9] In making this argument, Members Heritage repeatedly fails to cite to specific portions of the record to support these statements. *See* [R. 31-1, p. 23]. To be clear, the Court is not obligated to search the entire record to find support for Members Heritage's arguments. *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Nevertheless, the Court has reviewed the record, including those portions of Ms. Edwards's deposition cited in the background section of Members Heritage's briefing.

*Id.* (quoting *Gray v. Jackson Purchase Credit Ass'n*, 691 S.W.2d 904, 906 (Ky. 1997); *see also Hamilton v. Meridian Mut. Ins. Co.*, No. 2002-CA-001246-MR, 2003 WL 22064128, *4 (Ky. Ct. App. Sept. 5, 2003); *ISCO Industries, Inc. v. Federal Ins. Co.*, 587 F.Supp.3d 558, 573 (W.D. Ky. 2022) (quoting *Howard*, 955 S.W.2d at 527). In other words, detrimental reliance is an essential element of an estoppel claim. *See Hamilton*, 2003 WL 22064128, at *5 ("Without detrimental reliance, estoppel cannot be proved.").

In the present case, Members Heritage does not argue that New York Marine intentionally relinquished a known, existing right or power under the terms of the Policy. Rather, the Court understands that Members Heritage's claim for detrimental reliance is, in essence, a claim that New York Marine must be estopped from denying coverage, due to the representations made by its agents.[10] But, while Members Heritage cites to the five elements of estoppel, it makes no effort to address the individual elements. Having reviewed the briefing and the record, the Court finds that Members Heritage has failed to establish that each of these five elements is satisfied.

The first element requires "[c]onduct including acts, language and silence, amounting to a representation or concealment of material facts." *Howard*, 955 S.W.2d at 526 (quoting *Gray*, 691 S.W.2d at 906). From the best the Court can tell, Members Heritage believes that this element is satisfied because, according to Members Heritage, the defendants represented that the Welcome lawsuit would be covered under the Policy. But Members Heritage cites to no such statement in the record. In fact, the record reflects that, *prior to* the filing of the Welcome lawsuit, the defendants' July 17, 2020 letter advised Members Heritage that the Welcome claims (as

---

[10] For support, Members Heritage cites to case law from Indiana, New York, and North Dakota. *See* [R. 31-1, pp. 21–22]. However, as the parties agree and the Court has already explained, Kentucky's substantive law governs in this diversity action.

described in Welcome's demand letter, [R. 34-1, pp. 85–87]), "*potentially* implicate[]" coverage under Insuring Agreement C of the Policy. *Id.* at 91 (emphasis added). The defendants went on to state that "New York Marine further reserves all its rights under this insuring agreement." *Id.* In a section titled "New York Marine reserves all its rights under the Liability Policy," the defendants explain that "New York Marine further reserves all its rights under the Liability Policy, including, but not limited to, with regard to the following terms, conditions, and exclusions," then proceed to list certain definitions and exclusions under the policy. *Id.* at 91–95. Throughout the letter, Defendants repeat that Welcome's demand letter "potentially implicates" coverage under Insuring Agreement C, but New York Marine "reserves all of its rights under the Liability Policy." *See, e.g.*, *id.* at 95, 96. New York Marine further "reserves the right to reconsider and amend any coverage position described in this letter if it becomes aware of new or different facts, or if warranted by ongoing developments in this matter." *Id.* The letter concludes,

> New York Marine reserves all rights and defenses pursuant to the Liability Policy, any another policy of insurance issued by New York Marine and its affiliates, and at law, and does not waive any of them. New York Marine has not made all coverage position arguments available to it within this correspondence. New York Marine expressly reserves all rights to make additional arguments and take additional coverage positions as it deems appropriate. New York Marine reserves the right to commence a declaratory judgment lawsuit in order to confirm its coverage positions under the Liability Policy. No statements made herein constitute an admission by New York Marine of liability or other admission against interest regarding the underlying matters or relating to coverage.

*Id.* at 96.

The record is clear. New York Marine made an initial determination based on the factual allegations within the Welcome demand letter and concluded that those allegations "potentially implicate[d]" coverage under Insuring Agreement C. This initial determination, made based on the facts known at that time, is required under Kentucky law. *See Auto Club Property-Cas. Ins.*

*Co. v. Adler*, No. 1:14-CV-00046-JHM, 2015 WL 4934200, *3 (W.D. Ky. Aug. 18, 2015)

("Under Kentucky law, the determination of whether an insurance company has a duty to defend

its insured 'must be made at the outset of the litigation' by reference to the complaint and known

facts." (quoting *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814

S.W.2d 273, 279 (Ky. 1991))). New York Marine therefore agreed to provide a defense, but

under a reservation of rights, as allowed by Kentucky law.[11] *See, e.g.*, *Aetna Cas. & Sur. Co. v.*

*Com.*, 179 S.W.3d 830, 841 (Ky. 2005). Welcome then filed suit in North Carolina, adding new

factual allegations and specifically alleging that Members Heritage knew of Harrell's fraudulent

activity with respect to Member 1's line of credit and took actions to conceal that misconduct by

filing a fraudulent deed of trust and satisfaction.[12] *See, e.g.*, [R. 31-2, ¶¶ 32–41]. Based on these

new facts, New York Marine reevaluated its coverage position—something it expressly reserved

the right to do in its July 17, 2020 letter. *See* [R. 34-1, p. 96]. Due to the new factual allegations

within the complaint, New York Marine determined that the lawsuit was *not* covered by Insuring

Agreement C. Under Kentucky law, New York Marine's duty to defend ended at that point. *See,*

*e.g.*, *Adler*, 2015 WL 4934200, at *3 ("An insurer's duty to defend 'ends once the insurer

establishes that the liability is in fact not covered by the policy.'" (quoting *Ky. Ass'n of Counties*

*All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 635 (Ky. 2005))).

Despite Members Heritage's vague allegations to the contrary, there is nothing in the

record indicating that defendants misrepresented that the Welcome lawsuit was covered under

---

[11] Members Heritage argues that New York Marine owed it both a duty to defend and a duty to indemnify. While many of the cases cited herein address the duty to defend, that duty is broader than the duty to indemnify. *See Nautilus Ins. Co. v. Structure Builders & Riggers Mach. Moving Div., LLC*, 784 F. Supp. 2d 767, 771 (E.D. Ky. 2011). Thus, "[i]f there is no duty to defend, then there is no duty to indemnify." *Id.* (citation omitted).

[12] Welcome's demand letter notes only that "executives of MHCU handled this transaction and arranged for a deed of trust associated with [Member 1's] accounts to be prepared," but, unlike the Welcome complaint, does not go into further detail. *See* [R. 34-1, p. 85].

the Policy, nor is there any evidence whatsoever suggesting that the defendants misrepresented or concealed any material facts. To the extent New York Marine made any representations to Members Heritage, it simply explained that Welcome's lawsuit "potentially implicate[d]" coverage under the Policy, and it agreed to defend Members Heritage subject to a reservation of rights. *See, e.g.*, [R. 34-1, p. 91]. This is in stark contrast to cases where courts have reasoned that "it is the 'undertaking of providing a defense and *the omission of any mention of the possibility of a denial of coverage* that constitute a misrepresentation to the insured.'" *Kentucky Farm Bureau Mutual Insurance Co. v. Brewer*, 596 S.W.3d 620, 623 (Ky. Ct. App. 2020) (quoting *Knox-Tenn Rental Co. v. Home Ins. Co.*, 2 F.3d 678, 682 (6th Cir. 1993) (emphasis added)).[13]

Though the briefing is not clear, it is possible that Members Heritage has also attempted to argue that Defendants misrepresented that Brown's claim and Welcome's claims were "interrelated wrongful acts" under the Policy. *See* [R. 31-1, pp. 7–9, 23]. However, Members Heritage fails to cite to any statement by Defendants or any provision in the Policy suggesting that an otherwise-excluded wrongful act may somehow qualify for coverage merely because it is factually related to another covered wrongful act. At most, it appears that Defendants initially represented that Brown's claim and Welcome's claim were interrelated because both involved similar misconduct by Harrell and, as a result, only one deductible would apply. *See* [R. 34-1, p. 90]. Members Heritage seems to acknowledge as much in its own briefing. *See* [R. 31-1, pp. 7–9, 23]. Thus, Members Heritage has again failed to cite to a misrepresentation or

---

[13] Kentucky law also provides that, "[a]s a general rule when an insurer undertakes to defend an insured with knowledge that the policy does not make it liable for any loss, the insurer is estopped to deny liability." *ISCO Industries, Inc. v. Federal Ins. Co.*, 587 F.Supp.3d 558, 574 (W.D. Ky. 20220 (quoting *Hood v. Coldway Carriers, Inc.*, 405 S.W.2d 672, 673 (Ky. 1965)) (internal quotation marks omitted). In this case, there are no allegations, nor any evidence of record, to suggest that Defendants concealed such material facts when initially undertaking a defense in this case, under a reservation of rights.

concealment of material facts by Defendants. The first element of an estoppel claim is therefore unsatisfied.

For the same reasons, the second and third element also fail. It is also unclear how the fourth element—i.e., that defendants acted "with the intention or expectation [their] conduct will be acted upon"—could be satisfied in this case. *See Howard*, 955 S.W.2d at 526 (quoting *Gray*, 691 S.W.2d at 906). There is nothing in the record to suggest that the defendants' July 17, 2020 letter or any other statement or action by the defendants was in any way intended to induce Members Heritage to act (or decline to act) with respect to Welcome's claims. Again, Members Heritage fails to address these elements.

Instead, Members Heritage seems to focus primarily on the fifth element, i.e., that it relied upon Defendants' conduct to its detriment. *See id.* (quoting *Gray*, 691 S.W.2d at 906). In other words, Members Heritage argues that Defendants' conduct resulted in prejudice to Members Heritage. *See, e.g.*, *Am. Cas. Co. of reading, Pa. v. Shely*, 234 S.W.2d 303, 305 (Ky. 1950) ("One of the basic elements of an estoppel is that the person claiming it must have been prejudiced by the action the person against whom it is asserted."). On this point, Members Heritage argues that "courts have held that where an insurance company undertakes the defense of an accident case, the loss of the right by the insured to control or manage the case itself is prejudice." [R. 31-1, p. 20 (referring to *Cincinnati Ins. Co. v. Vance*, 730 S.W.2d 521 (Ky. 1987)]. Members Heritage is correct that, under Kentucky law, "[a] liability insurance company that undertakes to defend a putative insured may thereafter be estopped from later denying coverage and withdrawing representation because the loss of the right by the insured to control and manage the case is itself a prejudice which will cause an estoppel." *Vance*, 730 S.W.2d at 521 (citations omitted). However, the case cited by Members Heritage, *Vance*, also provides that

an insurance company "is not estopped from withdrawing from the defense of an action 'if its action does not result in any prejudice to the [putative] insured." *Id.* (quoting *Universal Underwriters Ins. Co. v. Travelers Ins. Co.*, 451 S.W.2d 616, 622 (Ky. 1970)) (internal quotation marks omitted). Thus, an insurance company's "decision to deny coverage and the duty to defend, to take no action, promptly communicated so that the putative insured will suffer no prejudice in making his own defense if he wishes to do so, does not cause an estoppel." *Id.* at 524.

More recent Kentucky case law explores these prejudice principles and distinguishes between cases in which the insurance company defends under a reservation of rights from cases in which the insurance company makes no such reservation. For example, in *Kentucky Farm Bureau Mutual Insurance Co. v. Brewer*, the court explained that, "[w]here the insurer defends an insured *without a reservation of rights*, 'the loss of the right by the insured to control and manage the case is itself a prejudice.'" 596 S.W.3d at 623 (emphasis added) (quoting *Shely*, 234 S.W.2d at 305). However, where the insurance company defends under a reservation of rights, "the insured has the option of accepting the insurer's defense or refusing the defense and conducting his own defense." *Id.* at 622 (citation omitted). And importantly, where an insurance company undertakes the defense of a putative insured under a reservation of rights, prejudice cannot be inferred merely because the insured accepted that defense. *Id.* at 623. Instead, prejudice must be proven. *Id.*; *see also Travelers Indem. Co. v Nieman*, 563 S.W.2d 724, 726 (Ky. Ct. App. 1977) (explaining that insurer was not estopped from denying coverage where it provided timely notice that it reserved the right to withdraw from the defense at any time and insureds suffered no detriment from the withdrawal).

Here, Members Heritage argues that, if it had known that an exclusion applied, it might have reconsidered selling the Zebulon branch, might have renegotiated the settlement with Brown, and would have continued to negotiate with Welcome. [R. 31-1, p. 12]. It explains that it

> lost the opportunity to negotiate [the] claim with Welcome early on, could not negotiated separately on the Ted Brown claim without the instruction and consent of Judy Edwards and finally, were (sic) thrust into a litigation with Welcome in North Carolina where it incurred both legal fees in Kentucky and in North Carolina on claims that could have been resolved, if Defendants had given permission for them to do so.

[R. 31-1, pp. 23–24]. But other than these unsupported assertions, Members Heritage fails to explain what action it took (or declined to take) in response to Defendants' initial conclusion that coverage *might* exist for Welcome's claims, or how any such action or inaction was to its detriment. At most, Members Heritage *suggests* that it might have expended more effort to negotiate with Welcome prior to the filing of the North Carolina lawsuit. But it fails to explain— much less cite to any evidence of record—how Defendants' initial coverage position affected its ability to negotiate with Welcome (or Brown), or how it was prevented from making its own defense in the case. In fact, Members Heritage claims in its briefing that Welcome refused to negotiate. *See* [R. 37, p. 4].

The Court also notes that Welcome filed its lawsuit on October 20, 2020, *see* [R. 31-2], and Defendants notified Members Heritage of its updated coverage position on November 16, 2020. [R. 34-1, pp. 97–106]. Members Heritage does not explain how Defendants' prompt communication of their coverage denial prejudiced Members Heritage's ability to make its own defense in the North Carolina lawsuit. *See Vance*, 730 S.W.2d at 524 (explaining that an insurer's "decision to deny coverage and the duty to defend, to take no action, promptly communicated so that the putative insured will suffer no prejudice in making his own defense if he wishes to do so, does not cause an estoppel"); *Brewer*, 596 S.W.3d at 622 (explaining that,

even in cases where the insurer defends without a reservation of rights, it may be estopped from denying coverage "after it has defended the insured for a *prolonged period*" (emphasis added)). For this reason and those stated above, Members Heritage has failed to demonstrate a genuine issue of material fact relating to the fifth factor of its estoppel claim.

In sum, Members Heritage has failed to prove (or even fully address) the five elements of estoppel. As such, Members Heritage's estoppel (or detrimental reliance) claim must fail.

## III. CONCLUSION

The Court finds that this case presents claims for declaratory relief as well as claims for damages. Under the facts of this case, the Court will maintain jurisdiction over the monetary claims and, having balanced the *Grand Trunk* factors, the Court will also exercise its discretion to accept jurisdiction over the declaratory claims. Having now reviewed those claims and the summary judgment briefing, the Court will grant summary judgment in favor of defendants on all counts.

Accordingly, **IT IS HEREBY ORDERED** as follows:

1. The Court will exercise its discretion under the Declaratory Judgment Act, 28 U.S.C. § 2201, and will retain jurisdiction over this matter.

2. Plaintiff Members Heritage's Motion for Summary Judgment, [**R. 31**], is **DENIED**.

3. Defendants New York Marine and ProSight's Motion for Summary Judgment, [**R. 32**], is **GRANTED**.

4. A corresponding judgment shall follow.

This the 31st day of July, 2023.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

- 38 -